**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No.: _____

STEPHANIE STRAUSS,

      Plaintiff,

v.

UNIVERSITY OF COLORADO, through its Board, THE REGENTS OF THE UNIVERSITY OF COLORADO, a body corporate,

      Defendants.

------------------------------------------------------------------------------------------------------------

**COMPLAINT AND DEMAND FOR TRIAL BY JURY**

------------------------------------------------------------------------------------------------------------

      Plaintiff, STEPHANIE STRAUSS, by and through her counsel, hereby files this Complaint against Defendant, UNIVERSITY OF COLORADO, through its Board, the REGENTS OF THE UNIVERSITY OF COLORADO, a body corporate, and in support thereof, states and alleges as follows:

**INTRODUCTION**

1.     Plaintiff Stephanie Strauss ("Plaintiff") is a thirty-eight (38) year-old Jewish, Hispanic, mother, and former Chief Pediatric Anesthetist at the University of Colorado ("Defendant").  With over a decade of experience, Plaintiff exhibited her passion for medicine, and aspired to attend medical school and become a physician.

2.     During the course of her employment, Plaintiff became pregnant and, to no surprise was overjoyed with the opportunity to expand her family. However, at the same time, she remained

dedicated to her career and professional aspiration, and assumed that she would be able to continue working while raising her children. After all, the right to keep her job during pregnancy and after having a baby has been the law for nearly four and a half decades, since the enactment of the Pregnancy Discrimination Act in 1978 ("PDA").

3.      Unfortunately, Defendant's officials believed otherwise, ultimately forcing Plaintiff to forego her livelihood because of her family status and religious beliefs. Initially, while Plaintiff was pregnant, Defendant's Anesthesiology Department Chair made express comments regarding Plaintiff's fitness, or purported lack thereof, to serve in a leadership position. She berated, admonished and harassed Plaintiff, and sought to make her a scapegoat in order to help cover-up her own discriminatory animus. When Plaintiff reported the Chair's actions to four (4) separate internal officers, she was told to "law low", that she had no job protection, and that nothing could be done. After returning from protected maternity leave, Plaintiff was forced to resign from her leadership Chief Anesthetist position, after being told that she would be removed by the Chair if she did not do so. Plaintiff complied in order to salvage her professional reputation, and was replaced by a white, non-Jewish, male who did not have children.

4.      Nevertheless, the harassment continued, and as a result Plaintiff has been clinically diagnosed with "work-related stress", having taken a protected leave of absence under the Family Medical Leave Act ("FMLA"). While on protected leave, Plaintiff was again threatened, this time by Defendant's former legal counsel to not disclose her prior complaints against Dr. Todorovic. Upon her return from protected leave, Plaintiff was pressured to quit her job altogether, being told that she should "focus on her family". Again, with no reasonable alternative in light of the ongoing harassment and the threat to her career if she were fired, Plaintiff resigned. Her plans to become a doctor in pediatric anesthesiology were completely derailed, she has been forced to abandon her

career and postpone her aspirations in medicine through no fault of her own, and has been insurmountably damaged.

5.      Defendant's treatment of Plaintiff - a Jewish, Hispanic, mother - is in clear violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. (Title VII), because she has been subjected to discrimination on the grounds of her gender (pregnancy), religion (Jewish), and national origin (Hispanic), and has faced retaliation after having reported same, a hostile work environment, and other deleterious terms and conditions of employment.  As such, Plaintiff seeks declaratory and injunctive relief as well as all available legal and equitable remedies to redress the effects of Defendant's systemic, pervasive and discriminatory employment practices towards her.

## THE PARTIES

6.      Plaintiff is a resident of the State of Colorado and was employed by Defendant University of Colorado at all times relevant to this Action.

7.      Defendant University of Colorado ("Defendant") is a state institution of higher education established and regulated by Article IX, §§ 12 and 13 of the Colorado Constitution and state statutory law, C.R.S. §§ 23-20-101, et seq., and may sue and be sued through its governing body, the Regents of the University of Colorado.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343.

9.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because the employment practices alleged to be unlawful were committed in the District of Colorado.

10.     At all relevant times, Defendant was an "employer" within the meaning of Title VII.

11.     Plaintiff has exhausted all administrative prerequisites to the filing of this action.

12.     This lawsuit was commenced within ninety (90) days of Plaintiff's receipt of a Notice of Right to Sue, dated September 7, 2021, from the United States Equal Employment Opportunity Commission ("EEOC") with respect to Charge of Discrimination No.: 541-2019-02478 filed with therewith.

## FACTUAL ALLEGATIONS

13.     Plaintiff, a Jewish, Hispanic woman, holds a Master of Medical Science Degree with a specialty in Anesthesiology and Patient Monitoring Systems from Emory University.  To qualify for enrollment in this program, Plaintiff was required to sit for the Medical School Preparatory Examination ("MCAT") and complete all pre-medical prerequisites.

14.     Beginning on September 14, 2009, Plaintiff commenced employment as a faculty member within Defendant's Anesthesiology Department, performing her clinical duties as an anesthetist at Defendant's subsidiary, Children's Hospital of Colorado ("CHCO").

15.     In 2013, Plaintiff was appointed as Chief Anesthetist, a leadership role in which she remained responsible for supervising and scheduling certified registered nurse anesthetists (CRNAs) and certified anesthesiologist assistants (CAAs) at CHCO.

16.     Defendant, through its supervisory officials, reviewed Plaintiff's performance on an annual basis and provided Plaintiff with an annual performance rating, written commentary, and on several occasions, an in-person meeting to discuss same (hereinafter referred to as Plaintiff's "PRiSM" reviews).

17.     For three (3) separate years, Plaintiff received a rating of "exceeding expectations" and for two (2) separate years, Plaintiff received a rating of "outstanding".

4

18.     Plaintiff never received a score below "meeting expectations", and none of her reviews reflected any significant problems with her leadership as Chief Anesthetist.

19.     Significantly, in 2014, the year immediately following her appointment as Chief Anesthetist, Plaintiff was deemed as "very successful" and able to "achieve a satisfied and content group of AAs and CRNAs".

20.     The following calendar year, 2015, Plaintiff was rated as having exceeded expectations, managing to secure respect from her team while handling interpersonal conflicts very well.

### *January 2016 – Dr. Todorovic assumes the role of Anesthesiology Department Chair*

21.     In 2016, Dr. Vesna Jevtovic-Todorovic ("Dr. Todorovic") assumed the role as Chair of the Department of Anesthesiology.

22.     In that capacity, Dr. Todorovic became the principal officer of the Anesthesiology Department, responsible for the effective and efficient administration thereof.

23.     Among other things, Dr. Todorovic was tasked with 1) making recommendations as to faculty appointments, promotions, tenure, and salary increments, 2) providing intellectual leadership toward achievement of the highest possible level of excellence in the teaching, research, and service activities of the Anesthesiology Department, and 3) providing direction in academic planning and support for faculty development.

24.     As department chair, Dr. Todorovic was also required to be receptive to questions, complaints, grievance and suggestions from faculty members, staff, and students, and to take appropriate action in response thereto.

### *November of 2016 – Plaintiff participates in annual "PRiSM" evaluation meeting and receives a score of "Outstanding"*

25.     On or about November 23, 2016, Plaintiff participated in a meeting to discuss her annual performance review.

26.     During the meeting, Plaintiff's primary reviewer indicated that Plaintiff had exhibited excellent clinical work, maintained a local, state and national reputation in the Anesthesia Assistant administrative realm, and would achieve promotion to Assistant Professor of Clinical Anesthesiology once she developed a robust teaching portfolio.

27.     Notably, her primary reviewer indicated that this increase in teaching load was in large part dependent upon Plaintiff's availability, as she had been spending a significant amount of time, and even uncompensated personal time, satisfying her administrative responsibilities as Chief Anesthetist.

28.     This 2016 PRiSM review was reduced to writing, wherein Plaintiff received a score of "Outstanding".

29.     Significantly, there were no indications that Plaintiff had exhibited any shortfalls with respect to her work performance.

***Early December of 2016 – Dr. Todorovic fosters contention within the Anesthesiology Department, a pretextual tactic to ultimately drive Plaintiff out of her leadership role.***

30.     Approximately two (2) weeks after Plaintiff's 2016 PRiSM meeting, Dr. Todorovic claimed to have received complaints from several anesthetists concerning micromanagement and/or lack of professionalism by their colleague anesthesiologists.

31.     In a knee-jerk response, Dr. Todorovic directed Plaintiff to immediately distribute an anesthetist evaluation of the CHCO physicians ("Physician Evaluation").

32.     Dr. Todorovic also advised Plaintiff that after she had shared the anesthetists' purported concerns with CHCO's interim Chief of Pediatric Anesthesiology, Dr. Judit Szolnoki ("Dr. Szolnoki") as well as financial manager Andrew Rice ("Mr. Rice) both allegedly became defensive.

33.     Dr. Todorovic stated to Plaintiff that that these leaders could not be trusted to look out for Plaintiff's and the anesthetist team's best interests, and that she had lost faith in their leadership capabilities.

34.     Dr. Todorovic directed Plaintiff to report directly to her with any future issues or concerns and to discuss the process and results of the forthcoming Physician Evaluation, which was to be completed before the end of the month.

35.     In retrospect, Dr. Todorovic's statements and directive were nothing more than an effort to pit Plaintiff against her colleagues, including Dr. Szolnoki, and exacerbate any minor discord within the Anesthesiology Department.

36.     Notwithstanding the alleged departmental dissonance, Dr. Todorovic praised Plaintiff as being a hard-working and committed faculty leader and showed gratitude towards Plaintiff for looking out for the Anesthetist team.

37.     Although Plaintiff believed that the underlying complaints were isolated, that the proposed Physician Evaluation was initiated hastily, and that distributing same would only cause exacerbate any existing rift, she nevertheless complied with Dr. Todorovic's directive.

**Late December of 2016 – Dr. Todorovic learns that Plaintiff is both Jewish and pregnant**

38.     Dr. Todorovic then requested a follow-up meeting with Plaintiff to further discuss the purported departmental issues.

39.     During the meeting held on or about December 23, 2016, Dr. Todorovic inquired as to Plaintiff's relationship with colleague Dr. David Polaner, a Jewish, nationally-recognized clinical/academic/research anesthesiologist.

40.     Dr. Todorovic also expressed gratitude that Plaintiff was available to participate in the requested meeting in light of the Christmas holiday, to which Plaintiff responded that both she and Dr. Polaner are Jewish, remarking on the shared religious belief and observance of Jewish holidays.  Plaintiff also indicated she had worked well with Dr. Polaner.

41.     At the time of the meeting, Plaintiff was noticeably pregnant with her second child, and she and Dr. Todorovic discussed the fact that this was Plaintiff's second pregnancy and that she had an eighteen (18) month-old child at home.

***March of 2017 –Defendant Todorovic dismissively questions Plaintiff's ability to serve in a management position while pregnant, stating that Plaintiff should consider her fitness for leadership because she had small children and that, perhaps, she should focus on her family.***

42.     Plaintiff met with Dr. Todorovic for a second time on March 10, 2017, when the former was eight (8) months' pregnant.  During this meeting, Dr. Todorovic told Plaintiff that she had heard, from an unnamed source or sources, that Plaintiff was stressed and needed to micromanage less.

43.     This was the first time that Plaintiff was told of any micromanagement issue, or for that matter, any concern about her leadership.

44.     Upon information and belief, those non-pregnant and non-Jewish faculty members in leadership positions were not accused of being ineffective leaders.

8

45.     Nonetheless, Dr. Todorovic suggested that Plaintiff solicit feedback from her team more regularly and specifically put into place a chief anesthetist evaluation to be completed by Plaintiff's subordinates.

46.     Plaintiff responded that she would be proactive in addressing any issues or potential complaints and would heed Dr. Todorovic's advice.

47.     In the course of the meeting, Dr. Todorovic gestured to Plaintiff's abdomen and stated, in a dismissive and rude tone of voice, that in light of her pregnancy and impending maternity leave, Plaintiff should consider her fitness for leadership because she had small children and that, perhaps, she should focus on her family.

48.     Dr. Todorovic also stated that Plaintiff should not trust Dr. Szolnoki nor Mr. Rice.

49.     Plaintiff was shocked by Dr. Todorovic's statements and their implications.

50.     Dr. Todorovic made statements concerning Plaintiff's pregnancy status to the Program Director of Defendant's Anesthesiologist Assistant Program, Ms. Elizabeth "Nikki" Block as well.

51.     Specifically, during a meeting between Ms. Block and Dr. Todorovic that took place shortly before Ms. Block's own maternity leave, Dr. Todorovic stated, in reference to Plaintiff, that "Pregnant women are too emotional to make rational decisions. I think I'll have to remove her from her chief role."

***Plaintiff reports Dr. Todorovic's discriminatory statements to Defendant's ombudsperson***

52.     Concerned about Dr. Todorovic's multiple statements with respect to her status as a pregnant woman and mother, Plaintiff reported the events that had transpired to Defendant's ombudsperson.

53.     In response, Defendant's ombudsperson advised Plaintiff to "lay low" and be careful as to her communicants and interactions because there was no guarantee of confidentiality with respect to reporting.

***Plaintiff circulates anonymous Chief Anesthetist Survey pursuant to Dr. Todorovic's directive, yet gets verbally abused and publicly admonished by her for doing so.***

54.     In part due to fear of losing her position at the university, Plaintiff followed the ombudsperson's advice and emailed Dr. Todorovic a plan for distributing an anonymous Chief Anesthetist Survey, which included questions about Plaintiff's leadership style, and which was consistent with Dr. Todorovic's suggestion during the March 10 meeting.

55.     Given that Dr. Todorovic had ordered Plaintiff to communicate directly with her, and not with Dr. Szolnoki nor Mr. Rice, she emailed Dr. Todorovic her plan and asked Dr. Todorovic to respond with any concerns.

56.     Dr. Todorovic did not respond with any changes to the Chief Anesthetist Survey, nor did she respond in any way to Plaintiff's email.

57.     Hence, Plaintiff proceeded as previously directed, and on April 4, 2017, distributed the Chief Anesthetist Survey to her subordinates, which elicited overwhelmingly positive responses.

58.     However, Dr. Todorovic requested a meeting held in the presence of both CHCO's incoming and outgoing chiefs of pediatric anesthesiology.

59.     During this April 12, 2017 meeting, Dr. Todorovic admonished Plaintiff for conducting the Chief Anesthetist Survey and told Plaintiff that her job was in jeopardy.

60.     Dr. Todorovic accused Plaintiff of having "listening problems" and stated that the review process should have been overseen by physicians, despite having been provided with the

survey in advance, an opportunity to comment or change same and never having raised this oversight concern previously despite ample opportunity to do so.

61.     During the April 12 meeting, Dr. Todorovic repeatedly spoke to Plaintiff in a derogatory tone of voice, told her to "be quiet" and demanded that she leave so Dr. Todorovic could decide "what to do with [her]." Defendant Todorovic accused Plaintiff of disobeying her in an effort to disrespect physician leadership, an allegation that Plaintiff denied.

62.     Dr. Todorovic also accused Plaintiff of "hiding things", stating that Plaintiff could not be trusted, just as she had previously told Plaintiff that neither Dr. Szolnoki nor Mr. Rice could not be trusted.

63.     Plaintiff respectfully expressed her different recollection of the March 2017 meeting, to which Dr. Todorovic asserted that Plaintiff was either a liar or had memory problems, and sarcastically asked Plaintiff if she would be able to remember the conversation then in progress.  When Plaintiff replied affirmatively, Dr. Todorovic said that it did not matter because no one trusted Plaintiff anyway.

64.     After inquiring whether Plaintiff believed that her demotion would be warranted, Dr. Todorovic dismissed her, stating that she had heard enough of Plaintiff's voice for one day.

65.     Dr. Todorovic also told Plaintiff that she was considering removing Plaintiff from her Chief Anesthetist role.

66.     During this meeting, Dr. Szolnoki also offered Plaintiff an administrative leave, with Defendant Todorovic's approval, for the duration of her pregnancy.

67.     Significantly, neither Dr. Todorovic nor Dr. Szolnoki provided Plaintiff with any specific examples of her alleged leadership failings or problems.

68.     Plaintiff was stunned and traumatized by Dr. Todorovic's egregious verbal abuse and could not even begin to comprehend Dr. Todorovic's reinvention of the terms of the March 2017 conversation, her false accusation of Plaintiff's purported disobedience, and her name-calling antics, all of which occurred in the presence of other leaders within the department.

***Plaintiff makes a second report of Dr. Todorovic's discriminatory statements as well as her verbal abuse to Defendant's Office of Professionalism***

69.     Two (2) days after being verbally abused by Dr. Todorovic, Plaintiff sent an e-mail to the director of the Office of Professionalism ("OOP"), reporting what had transpired at both the March and April 2017 meetings.

70.     In her report, Plaintiff stated that she believed Dr. Todorovic's threats and comments discriminated against her based on her protected status as a pregnant woman.

71.     Plaintiff specifically reported that Dr. Todorovic had spoken to her in a condescending and hostile manner, and that she feared retaliation including, but not limited to, demotion, reduced pay and discharge.

72.     The director of the OOP advised Plaintiff to meet with a member of the human resources department.

***Plaintiff makes third and fourth reports of Dr. Todorovic's behavior to Defendant's Human Resources Director and Office of Equity/Title IX Director***

73.     On April 17, 2017, Plaintiff emailed Douglas Kasyon, Director of Employee Relations and Performance for Defendant's Human Resources office, again reporting Dr. Todorovic's behavior.

74.     In response, Mr. Kasyon stated that he could not assist Plaintiff unless she authorized him to speak with Dr. Todorovic.

75.     Mr. Kasyon also informed Plaintiff that she had no job rights or protections as an at-will employee.

76.     Fearing further retaliation, Plaintiff asked that Mr. Kasyon not speak with Dr. Todorovic.

77.     In light of Plaintiff's complaint of gender (pregnancy) discrimination, Mr. Kasyon ultimately referred Plaintiff to Karey Duarte (now Krohnfeldt) of the Title IX Office/Office of Equity.

78.     Plaintiff again reported Dr. Todorovic's behavior to Ms. Duarte, who indicated that she could not help Plaintiff in the absence of any adverse action taken against Plaintiff.

***Upon returning from maternity leave, and after having made four (4) reports of adverse employment action, Plaintiff learns that Dr. Todorovic intends to remove her from the Chief Anesthetist position.***

79.     Plaintiff went on a protected maternity leave pursuant to the Family Medical Leave Act, returning to work in August 2017.

80.     Upon her return, Plaintiff discovered that her role and authority as Chief Anesthetist had been undermined in her absence; individuals who, previous to her leave, were under her supervision, were now confused whether to report to her or the acting Chief Anesthetist who had served during her leave.

81.     After waiting in "limbo" for two weeks following her return, Plaintiff met with newly appointed Chief of Pediatric Anesthesiology, Dr. Thomas Majcher.

82.     During this meeting, Dr. Majcher told Plaintiff that she would not be permitted to return to her position as Chief Anesthetist and urged her to resign from that position because, if she did not do so, Dr. Todorovic would involuntarily remove her, leaving a demotion on her record.

83.     Dr. Majcher indicated that he anticipated that Plaintiff would simply resign from the position on her own accord upon her return from leave, and that Dr. Todorovic no longer had faith in her leadership abilities.

84.     Dr. Majcher further indicated that as "commander in chief", Dr. Todorovic had the ability and power to effectuate Plaintiff's demotion.

85.     Of note, Plaintiff testified before this honorable Court

***With no reasonable alternative, Plaintiff is forced
to resign as Chief Anesthetist.***

86.     Fearing the consequences of demotion from her role as Chief Anesthetist, Plaintiff again contacted Mr. Kayson and Ms. Duarte.

87.     In response, Mr. Kasyon suggested that Plaintiff schedule a meeting with Dr. Todorovic but did not otherwise offer any support, while Ms. Duarte implied that Plaintiff had unspecified performance issues, and similarly, did not offer any support.

88.     Plaintiff ultimately realized that she was left defenseless, without any support from Defendant's officials, that she would not be able to retain her leadership position no matter what she did, and that if she did not resign, she would be removed and this would leave a permanent scar on her professional record.

89.     With no reasonable alternative, Plaintiff submitted a resignation letter with respect to her leadership role, dated September 8, 2017.

90.     In response, Dr. Majcher sent an e-mail to the anesthetist team, indicating that Plaintiff had decided to resign her role as Chief Anesthetist to "focus on her family", thereby attempting to whitewash the blatantly discriminatory events that had occurred.

91.     At the time that her role as chief anesthetist ended, Plaintiff was earning an annual salary of approximately $185,000.

92.     Significantly, Plaintiff was replaced in her leadership position by a white, non-Jewish, non-Hispanic male who did not have children.

***After resigning as Chief Anesthetist, the harassment and hostile work environment continues, and Plaintiff requests a leave of absence.***

93.     Thereafter, the pattern of harassment and hostile work environment continued, and Plaintiff was left without the ability to approach her supervisor, feeling threatened that her employment could be terminated at any time.

94.     Plaintiff recognized that she had no internal protection from Dr. Todorovic's actions, as her prior complaints had already proved futile.

95.     Dr. Todorovic remained off-putting and cold towards Plaintiff and was entirely unapproachable.

96.     Plaintiff was ostracized, and her reputation in the Anesthesiology Department was tarnished due to no fault of her own.

97.     Plaintiff continued to work in constant fear of looming termination, which would have visited significant financial and reputational impact on her and her family.

98.     Ultimately, Plaintiff was no longer able to function under such circumstances and requested a leave of absence pursuant to the Family Medical Leave Act ("FMLA").

99.     In fact, in support of her request for FMLA leave, Plaintiff's clinical psychologist certified that Plaintiff suffered from "work related stress."

***Plaintiff is personally and professionally threatened by Defendant's legal counsel, placed on administrative leave, and ultimately forced to resign from her employment due to ongoing hostility.***

100.    On December 11, 2018, Defendant's prior counsel, Mr. David Temple, contacted Plaintiff concerning litigation commenced by Plaintiff's colleague Dr. Jeffrey Gonzales.

101.     Dr. Gonzales, a former anesthesiologist at the University of Colorado, had been discharged by Dr. Todorovic and commenced an action in this Court (No 1-18-cv-01178-RJB), asserting that he too had been subject to national origin discrimination at the university and was retaliated against for having reported same.  A jury found that Dr. Gonzales had suffered illegal retaliation and awarded him substantial damages, and Judge Jackson reversed Dr. Todorovic's discharge, ordered that Dr. Gonzales be reinstated to the position of Assistant Professor of Anesthesiology, made clear that the university's leadership needed to institute a thorough and objective investigation of its EEO policies and procedures and Dr. Todorovic's leadership of the Department of Anesthesiology, and precluded Todorovic from having any role in Dr. Gonzales' promotion to Associate Professor of Medicine in the Department of Anesthesiology. (ECF Doc. No. 101)

102.     In the course of that litigation, Mr. Temple had seen e-mails between Plaintiff and Mr. Kasyon with respect to Dr. Todorovic.

103.     Mr. Temple inquired whether Plaintiff had made a complaint against Dr. Todorovic and told her that, if she had done so, he needed to submit those documents to Dr. Gonzales' counsel.

104.     During that conversation, Mr. Temple told Plaintiff that it would not be good for her or her family if she were dragged into that litigation.

105.     On December 12, 2018, Plaintiff sent an e-mail to Defendant's counsel confirming that her e-mails constituted a complaint against Dr. Todorovic.

106.     Notably, Plaintiff subsequently filed a complaint with the Colorado Bar against Mr. Temple, asserting that she perceived Mr. Temple's statements to be an explicit threat to her, both personally and professionally.

107.    Plaintiff's 2018 PRiSM review, prepared by her successor as chief anesthetist, Mr. Barfield, and Dr. Majcher, stated that she was an "outstanding, experienced and much appreciated provider" adding that she was struggling with career and health issues.

108.    However, the "career issue" that Plaintiff faced was the hostile work environment she encountered in the Anesthesiology Department.

109.    Plaintiff's health issues were the result of an emotional health, work-related injury, in addition to physical injury for which she was eligible for workers' compensation treatment and benefits.

110.    As a result of the ongoing negative impact that her work environment placed on her health, Plaintiff took an authorized leave of absence under FMLA in March and April of 2019.

111.    Upon Plaintiff's return from FMLA leave in May of 2019, Dr. Majcher encouraged her to quit her job altogether in order to focus on her family, a theme repeatedly asserted by Defendant's officials in order to shift the narrative away from the discriminatory and hostile work environment that Plaintiff suffered.

112.    Notwithstanding her outstanding performance and ten (10) years of employment, Plaintiff remained in fear of imminent discharge and the ongoing consequences to her mental health and professional reputation, regarding her circumstances to be tantamount to constructive discharge.

113.    At that time, Plaintiff also learned of Dr. Todorovic's pattern of similar discriminatory and retaliatory behavior towards other faculty members and staff within the Anesthesiology Department, including mothers of young children, Hispanic faculty and staff, Jews and older employees.

114.     Plaintiff feared suffering the same fate as a Jewish, Hispanic female with two young children, as these other employees, especially given the discriminatory treatment she had already suffered by Todorovic and the accompanying threats to her career and reputation, and the fact that no one in the university charged with the responsibility of enforcing anti-discrimination laws and policies was willing to assist or protect her.

115.     Given this discriminatory and toxic work environment, Plaintiff concluded that she had no choice but to leave her job rather than face the risk of a permanent scar on her employment record. She knew that, given the dominance of Defendant as virtually the only hospital system in the state, she could not work elsewhere as an anesthetist if her employment record was stained by a discharge.

116.     With no reasonable alternative, and following discussions with Dr. Majcher, Plaintiff resigned from her position in June 2019, effective July 6, 2019.

117.     At the time of her notice, Plaintiff was informed by the Department of Anesthesiology that she was not eligible for a performance incentive bonus based on criteria that were inapplicable to her position.

118.     Thereafter, in July 2019, she was advised that she would receive a reduced bonus in October 2019, ostensibly because of an unspecified "overpayment".

119.     Ultimately, Plaintiff received a virtually insignificant bonus and subsequently learned that it was part of a pattern by Dr. Todorovic to deny rightful and full bonuses to Jewish members of the department.

120.     Plaintiff did not quit her job voluntarily - the ongoing discrimination and harassment were tantamount to constructive discharge, as confirmed by Dr. Majcher.

121.     At the time that her job ended, Plaintiff earned approximately $125,000 per year.

***After being forced out of the university, Plaintiff
files EEOC Complaint and testifies against the
university in her colleague Dr. Gonzales' case (the
"Gonzales Matter")***

122.    On October 4, 2019, Plaintiff filed a Charge of Discrimination with the EEOC (No.: 541-2019-02478) with respect to the foregoing circumstances, and after a lengthy investigatory period, her "Right to Sue" letter was issued on September 7, 2021.

123.    On December 17, 2019, Plaintiff testified during the trial of the Gonzales matter as a witness called by the plaintiff, and attested to the ongoing discrimination that both her and her colleagues had faced, all at the hands of Dr. Todorovic.

124.    Following her testimony in the *Gonzales* matter, the presiding Federal District Court Judge Hon. R. Brooke Jackson rendered a written decision 1) acknowledging the existence of evidence that Dr. Todorovic engaged in discriminatory conduct against Plaintiff (and others), 2) that Plaintiff's testimony, in contrast to that of Dr. Todorovic, was credible, 3) the response to claims of discriminatory and retaliatory conduct within the Department was "seriously lacking", 4) the avenues for reporting claims of discrimination, including Human Resources, the Office of Equity, and the Office of Professionalism, are duplicative and ineffectual, 5) the circumstances were true not just for Dr. Gonzales, but for Plaintiff and her colleagues as well.

125.    Plaintiff has been irrevocably damaged by the "badge of infamy" surrounding her separation from employment, resulting in limiting or completely precluding her continued government employment in Colorado as an anesthetist, a severe restriction of the job market, and the deprivation of her liberty interests in employment.

126.    Plaintiff's prospects of gainful employment in her chosen professional endeavors have been stifled by Defendant's discriminatory, retaliatory, and hostile conduct.

127.   As a proximate result of Defendant's actions and inactions, Plaintiff has suffered loss of earnings, bonuses, pension and other employment benefits.

128.   As a further proximate result of Defendant's actions and inactions, Plaintiff has suffered impairment and damage to her good name and reputation.

129.   As a further proximate result of Defendant's actions and inactions, Plaintiff was unable to ameliorate her employment situations with Defendant.

## STATEMENT OF CLAIMS

### FIRST CLAIM FOR RELIEF
(Discrimination and Hostile Work Environment in Violation of Title VII of the Civil Rights Act of 1964, as amended)

130.   Plaintiff, as a female, is a member of the class of persons protected from discrimination on the basis of gender under Title VII.

131.   Plaintiff, as a then-pregnant woman, is a member of the class of persons protected from discrimination on the basis of gender under Title VII.

132.   Plaintiff, as a member of the Jewish faith, is a member of the class of persons protected from discrimination on the basis of religion under Title VII.

133.   Plaintiff, being of Hispanic origin, is a member of the class of persons protected from discrimination on the basis of national origin under Title VII.

134.   Defendant, by and through its agents, including its supervisory officials and internal faculty-affairs officers, intentionally engaged in unlawful employment practices against Plaintiff because she is a woman, is Jewish, Hispanic and was pregnant.

135.   Defendant, by and through its agents, including its supervisory officials and internal faculty-affairs officers, intentionally engaged in unlawful employment practices against Plaintiff because she was a then-pregnant female.

136.     Defendant, by and through its agents, including its supervisory officials and internal faculty-affairs officers, intentionally engaged in unlawful employment practices against Plaintiff because she is Jewish.

137.     Defendant, by and through its agents, including its supervisory officials and internal faculty-affairs officers, intentionally engaged in unlawful employment practices against Plaintiff because she is Hispanic.

138.     Defendant, by and through its agents, including its supervisory officials and internal faculty-affairs officers, discriminated against Plaintiff in connection with the terms, conditions and privileges of employment in violation of 42 U.S.C. § 2000e(2)(a).  The effect of these practices has been to deprive Plaintiff of equal employment opportunities and otherwise adversely affect her status because of her gender, religion, and/or national origin.

139.     Defendant's unlawful employment practices, by and through its agents, including its supervisory officials and internal faculty-affairs officers, had a disparate and adverse impact on Plaintiff because of her gender, religion, and/or national origin.

140.     Plaintiff was subjected to a hostile work environment based upon her membership in protected classes and she suffered disparate treatment as a direct consequence thereof.

141.     Defendant retaliated against Plaintiff because of her membership in protected classes, resulting in her involuntary demotion and separation from employment.

142.     Defendant is responsible and liable for the acts and omissions of its agents and employees.  Defendant, by and through its agents, including its supervisory officials and internal faculty-affairs officers, have discriminated and retaliated against Plaintiff on the bases of gender, religion, and/or national origin.

143.    As a consequence of Defendant's conduct, and those of its supervisory officials and internal faculty-affair officers, Plaintiff has been damaged.

144.    Defendant's conduct was engaged in with malice or with reckless indifference to Plaintiff's federally protected rights within the meaning of Title VII.

## SECOND CLAIM FOR RELIEF
(Retaliation in Violation of Title VII of the Civil Rights Act of 1964, as amended)

145.    Plaintiff opposed practices targeted at herself that were unlawful under Title VII, including discrimination and hostile work environment based on gender, religion, and/or national origin.

146.    As a result of Plaintiff's protected opposition to discrimination and the hostile work environment engendered and perpetuated by Defendant, Defendant retaliated against her by subjecting her to different terms and conditions of employment as described in this Complaint.

147.    Defendant's conduct violated 42 U.S.C. § 2000e-3(a) of Title VII.

148.    As a direct and proximate result of Defendant's actions, Plaintiff has suffered damages, including lost wages and benefits, diminished reputation, and other pecuniary losses, and emotional pain and suffering, mental anguish, inconvenience, loss of the enjoyment of life, and other non-pecuniary losses.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff, Stephanie Strauss, respectfully requests that this Court enter judgment in her favor and against Defendant, and order the following relief against them, respectively, to the extent provided by law:

A.    Compensatory damages including, but not limited to, those for emotional distress, inconvenience, mental anguish and loss of enjoyment of life;

B.    Back pay and benefits;

C.      Injunctive and declaratory relief;

D.      Front pay and benefits;

E.      Attorneys' fees and costs of this action, including expert witness fees, as appropriate;

F.      Pre-judgment and post-judgment interest at the highest lawful rate; and

G.      Such further relief as justice requires or the law allows.

**FURTHERMORE,** Plaintiff specifically prays that Defendant be enjoined for failing or refusing to:

(1)      Provide sufficient remedial relief to make Plaintiff whole for the losses she has suffered as a consequence of the discrimination, hostile work environment, and retaliation against her as alleged in this Complaint, including restoring Plaintiff to her position as Chief Anesthetist at Defendant university; and

(2)      Take such other appropriate non-discriminatory measures to overcome the effects of the discrimination and retaliation.

**<u>PLAINTIFF DEMANDS TRIAL BY JURY ON ALL ISSUES SO TRIABLE.</u>**

Respectfully submitted: December 6, 2021.

By:    KATZ AND KERN, LLP

*s/ Chet Kern*
_____
Chet Kern, Esq.
44 Cook Street
Denver, Colorado 80206
Tel. (303) 398-7000
Email: ckern@katzandkernllp.com
*Attorneys for Plaintiff*

## CERTIFICATION OF GOOD STANDING

I hereby certify that I am a member in good standing of the Bar of this Court.

*s/ Chet Kern*

Chet Kern, Esq.
KATZ AND KERN, LLP
44 Cook Street
Denver, Colorado 80206
Tel. (303) 398-7000
Email: ckern@katzandkernllp.com
*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I certify that on December 6, 2021, I filed the foregoing with the Clerk of the Court using the CM/ECF System.

s/ Chet Kern

Chet Kern, Esq.
KATZ AND KERN, LLP
44 Cook Street
Denver, Colorado 80206
Tel. (303) 398-7000
Email: ckern@katzandkernllp.com
*Attorneys for Plaintiff*